In re Robert M. **PRESTWOOD**, Debtor.

**Marika Tolz, Chapter 7 Trustee, Plaintiff,**

v.

**Robert M. Prestwood, Colleen M. Prestwood a/k/a Colleen Murphy, and Lauren Financial Services, Inc., Defendants.**

**Bankruptcy No. 02–23764–BKC–PGH. Adversary No. 03–6609–BKC–PGH–A.**

United States Bankruptcy Court, S.D. Florida.

Feb. 9, 2005.

D. Brett Marks, Kluger, Peretz, Kaplan & Berlin, P.L., Miami, FL, for Plaintiff or Petitioner.

Kari A. Keidser, Fredman/Lieberman LLP, Los Angeles, CA, for Defendant or Respondent.

### MEMORANDUM DECISION AND ORDER

THOMAS S. UTSCHIG, Bankruptcy Judge.

The notion of "home" is an elusive and elastic concept that remains a powerful component of virtually every culture. Emily Dickenson wrote, "Where thou art, that is Home." Robert Frost observed that "Home is the place where, when you have to go there, they have to take you in." Johann Wolfgang von Goethe claimed, "He is the happiest, be he king or peasant, who finds peace in his home." And Christian Morgenstern offered, "Home is not where you live, but where they understand you."

In legal terms, we demand more than flowery images when we attempt to define what constitutes one's "home." [1] Nonetheless, the concept remains important—we use it to determine the reach of the jurisdiction or venue of a court, to quantify citizenship, and to ascertain eligibility for various governmental programs, taxes, and more. The importance we place upon one's home is also reflected in how the principle is enshrined in the homestead exemptions of the various states. The notion that the home is not only one's castle but that one's castle should be protected from one's creditors is very much a part of the American legal landscape, and that is never more evident than in the very generous homestead exemption found in the Florida Constitution. It is the extent of that protection which is the subject of this decision.

On January 11, 2005, this matter came on for trial before the Court. The trustee's adversary complaint in this case seeks to recover certain alleged fraudulent transfers and also objects to the debtor's claimed homestead exemption. The matter was bifurcated and the Court only considered evidence as to the issue of the debtor's homestead. The remaining matters will be heard at a later date.[2] The Court considered the live testimony of both Robert Prestwood and his wife, Colleen Prestwood, as well as the deposition testimony of a variety of third parties which were presented by way of written submissions, in order to reach the following findings of fact and conclusions of law.

The procedural facts are as follows. The debtor filed this bankruptcy case on May 12, 2002. Marika Tolz was appointed as the chapter 7 trustee. In his schedules, the debtor listed an interest in a condominium located in Pompano Beach, Florida, which he claimed as his homestead. On October 3, 2003, the trustee filed a complaint against the debtor, his wife, and Lauren Financial Services, Inc., a company apparently owned by Michael Murphy, Mrs. Prestwood's brother.[3] The first count of the complaint contends that the debtor is not entitled to claim a Florida homestead because he never intended to live in Florida but simply kept a "vacation property" here.[4]

At trial, the debtor testified that in June of 1999, he and his wife, along with their twin children (who were seven months old at the time), packed up all their belongings, rented a large U–Haul truck, and moved from California to the Pompano Beach condominium. It is the debtor's contention that from that point on, he lived in Florida but routinely traveled back to California for his work with XS Networks, Inc., an Internet-related company. At the outset, the Court should note that Mr. Prestwood's testimony often seemed evasive and deliberately vague on many points. However, much of his evasiveness

**1.** Indeed, *Black's Law Dictionary* rather prosaically defines it simply as "a dwelling place."

**2.** The trustee has also filed a nondischargeability action against the debtor which was consolidated with this case for purposes of discovery and trial. The fraudulent transfer claims, together with the nondischargeability issues, will be tried to the Court on March 1, 2005.

**3.** The trustee conducted a Rule 2004 examination of the debtor on August 15, 2002.

Shortly thereafter, the debtor converted the case to chapter 13 and spent a few brief months trying to fund a chapter 13 plan. The case was ultimately re-converted to chapter 7 after the debtor failed to make plan payments, and Marika Tolz was reappointed as trustee.

**4.** The remaining counts all relate to various claims regarding the debtor's rights to property in California which will be heard as indicated in footnote 1, *infra*.

seemed related to questions about other aspects of his business dealings and not necessarily to the cross-country relocation.

The principal area of confusion relates to the substantial residential property the debtor and his wife owned in Huntington Beach, California. While an accurate assessment of the property's value is as of yet uncertain, it has been estimated that the home was worth approximately $1,000,000 in May of 1999. Based on that valuation, it would appear that the debtor and his wife had significant equity in the home when they transferred ownership of the property to Lauren Financial, the company owned by Mrs. Prestwood's brother, for what appears to have been a somewhat illusory 20% interest in the company.[5] At about the same time as this transfer, the debtor acquired the Pompano Beach property.[6] The debtor also leased some commercial property in Florida, ostensibly in order to expand his own mortgage brokerage business, Annwin Corporation.

The trustee believes the transfer to Lauren Financial constitutes a fraudulent transfer. The timing of these transfers and the rather fluid nature of the debtor's testimony as to the reasoning behind the transfer of his home to Lauren Financial may well be critical components of the remainder of the trustee's case. However, for purposes of the homestead issue, the inquiry is rather simple: did the debtor in fact move to Florida with the intent to reside there indefinitely? In that regard, the debtor *did* purchase a Florida residence at about the time he transferred ownership of the California property, and he *did* lease commercial property in a manner consistent with his testimony. Nonetheless, the Court must admit that the evidence regarding the debtor's actual domicile after the transfer of the California home is at best mixed. In support, the debtor, Colleen Prestwood, and Michael Murphy all testified about the June 1999 move. Indeed, Mr. Murphy claims to have driven the U–Haul truck. Further, the debtor testified that while most of his mail went to a "mail drop" in California, he did receive some mail and magazine subscriptions (including a subscription to the *Wall Street Journal*) at the Pompano Beach property.

The trustee, however, points out that prior to the petition date, the debtor did not have a Florida bank account or own a car registered in Florida. The debtor obtained a Florida driver's license on February 14, 2002, the same day he signed his bankruptcy petition. The debtor failed to claim Florida's homestead ad valorem property tax exemption, which allows for a reduction in the payment of real estate taxes for Florida residents. The debtor's bankruptcy petition shows a California mailing address. He even filed bankrupt-

---

**5.** There was a fair amount of testimony at trial about the reason for the transfer. Mr. Prestwood has worked as a mortgage broker at various times, and Lauren Financial was apparently set up to operate such a business. According to the debtor's testimony, Lauren Financial was to be operated by Mr. Murphy, who did not have any background in the business. In order to qualify for certain programs with the Department of Housing and Urban Development, Lauren Financial apparently needed an asset base that was satisfied by the transfer of the house.

**6.** The trustee makes much of the size differential between the two properties. The Huntington Beach home was a 3,000 square foot residence, while the Pompano Beach condo was "only" 1,800 square feet. It is unclear exactly why it would be so inconceivable for a family of two adults and two infants to relocate into a condominium unit which is as large as many homes. Of perhaps greater importance for the present inquiry is the fact that when he purchased the condo he informed the condominium association that he was buying it as a "seasonal residence."

cy in California in 2001.[7]  The debtor's tax returns for 2000 and 2001 both list the California home as his residence.   On credit applications and personal guaranties given to vendors doing business with Annwin Corporation, the debtor listed the California property as his residence.   The trustee also supplied the Court with bank records showing the use of Mrs. Prestwood's debit card; most of the charges were incurred in California, not Florida.

The debtor's explanations of these points vary.  As to the issue of the mailing address, the debtor's testimony is that since he traveled extensively in the context of his occupation, he preferred to use a "mail drop" so that his mail could then be shipped to him by Federal Express anywhere in the world.  Since he had originally resided in California, he continued to use the California mail drop since he was still traveling frequently and it didn't really matter where the mail was sent initially. He indicates that he didn't know about the Florida homestead exemption for purposes of property taxes, and claims that the use of the California address on the tax returns, corporate guaranties and the like was the result of mistake or oversight. Finally, he indicated that his desire to move to Florida placed significant stress on his marriage, and that Colleen Prestwood spent a considerable amount of time in California during what amounted to various periods of separation.[8]

Perhaps the most significant objection the trustee raises regarding the debtor's purported Florida homestead is the fact that the debtor continued to work for various California companies.  The trustee offers the testimony of various former co-workers of the debtor from XS Networks which casts some question upon the debtor's choice of domicile.  According to Connie Jordan, the president of XS Networks, the debtor began employment with the company as vice president of sales in October of 2000 and remained so employed until sometime in August or September of 2002 (several months after his Florida bankruptcy filing).  The documents associated with his employment (including his W–4 Withholding Affidavit and the like) referenced the Huntington Beach address. Ms. Jordan also testified that she would not have hired someone for the debtor's position with the company unless that person resided in California.  The trustee also points to Ms. Jordan's testimony, as well as the testimony of co-workers Matt Hallstrom and Paul Havens, as further evidence that Prestwood lived in California, not Florida.[9]

In contrast, the debtor seeks to impeach the testimony of Connie Jordan by docu-

---

7.  Some of the confusion may have been due to the debtor's use of a petition preparation service called "We the People."  An attorney subsequently advised the debtor that he should have filed bankruptcy in Florida, not California.  The California case was apparently dismissed without incident.

8.  Mrs. Prestwood apparently lived in the Huntington Beach home during these periods.  Both her brother and her father may have also resided at the house during various times; Michael Murphy and Mrs. Prestwood's father are Canadian citizens, and seem to travel somewhat freely between the two locales.

9.  For example, it appears that Jordan, Havens, and Hallstrom all thought the debtor lived in California until sometime in 2002. Ms. Jordan and Mr. Hallstrom testified that they were invited to parties at the Huntington Beach property in 2001.  Mr. Havens testified that the debtor told him the Pompano Beach property was his "vacation" home.  The company's "daily sign in sheets" suggest that the debtor was on the premises far more frequently than he indicated in his testimony, and Hallstrom and Havens both indicated that they frequently had lunch with the debtor.

menting what debtor's counsel referred to as her "creepy obsession" with Mr. Prestwood. Perhaps the culmination of the feud between the two is reflected in the events surrounding the XS Networks website and the information provided there about its employees. The debtor introduced a copy of a page from the company's webpage that indicated Prestwood "lived in Florida." Ms. Jordan contends that the website was altered without her consent by a cohort of the debtor, and she went so far as to complain to web search engine Yahoo about the situation, even though the search engine has no apparent role in updating or maintaining the company's website.

It is clear from the record that Ms. Jordan and the debtor have developed an impressive—and mutual—antipathy toward one another, even though the reasons are less certain. In that regard, it remains unclear what motive Ms. Jordan might have had to falsify XS Networks' sign in logs to make it appear that the debtor was on site more frequently than he contended, although it does appear that there are significant disparities in the execution of his initials on various days. In any event, it does appear that at some point the debtor was responsible for some of XS Networks' "East Coast" activities, and the testimony of both Hallstrom and Havens indicates that the debtor was often absent from XS Networks' California offices for extended periods of time. Hallstrom also indicated in his testimony that at "some time" while he worked at XS, Prestwood told him he was moving permanently to Florida, and that Prestwood would be "working out of Florida." [10]

What this array of conflicting testimony means is that there is no "smoking gun,"

no concrete, conclusive evidence of the debtor's actual domicile or homestead. That is perhaps not surprising given the debtor's occupation; many people, it seems, currently live a sort of semi-nomadic existence traveling routinely between various points that could almost equally be called "home." That is most definitely true among those who, like the debtor, are employed in Internet-related businesses that require travel and yet exist in some sort of "virtual world" as well. The debtor repeatedly stressed how it was possible for him to work from his home office as long as he had his computer and a broadband Internet connection.

While it seems odd to think of someone "telecommuting" from the opposite coast, it is certainly possible in today's networked business environment. Arguably, such a person might well have as haphazard an attitude toward the traditional indicia of homestead as the debtor in this case. Such things as one's mailing address become a transitory concept, based more on ease of access wherever one might be at the moment, rather than on the idea that one's mail should be sent to where you "live." It is, one might suggest, simply the modern equivalent of the old saying, "Home is where I hang my hat."

None of this, however, should imply that such a debtor is to be denied the opportunity to claim a homestead to the extent one is appropriate. Indeed, one of Florida's strongest exemptions is that which protects homestead property. *See Colwell v. Royal International Trading Corp.*, 226 B.R. 714 (S.D.Fla.1998); *In re Meola*, 158 B.R. 881, 882 (Bankr.S.D.Fla. 1993) (the homestead exemption "has long been embodied in the organic law of this

---

**10.** Hallstrom also said that since Prestwood was involved in sales, "he really could work anywhere."

state"). As more than one court has indicated, the Florida Constitution grants debtors "a liberal exemption" for homestead property. *Englander v. Mills (In re Englander)*, 95 F.3d 1028, 1031 (11th Cir. 1996); *In re McClain*, 281 B.R. 769 (Bankr.M.D.Fla.2002). In Florida, a homestead is established when there is "actual intent to live permanently in a place, coupled with actual use and occupancy." *In re Brown*, 165 B.R. 512, 514 (Bankr.M.D.Fla.1994). Ultimately, all that is required is that the property owner reside on the property and in good faith make the same his permanent home. *Colwell*, 226 B.R. at 719; *see also Judd v. Schooley*, 158 So.2d 514, 516 (Fla.1963). Exceptions to the homestead exemption should be strictly construed in favor of claimants and against challengers. *In re Ehnle*, 124 B.R. 361, 363 (Bankr.M.D.Fla. 1991).

■ It is with these directives in mind that the Court turns to the most persuasive testimony offered on this issue—namely, the testimony of Colleen Prestwood, the debtor's wife. While the veracity of the debtor's testimony might have been questionable on various occasions, Mrs. Prestwood seemed quite honest in her statements about her husband, his decision to move to Florida, and her reaction to it. She very clearly disliked even the idea itself, and the marriage suffered as a result. When questioned, she indicated that she thought Mr. Prestwood would still be in Florida but for her; their relocation back to California after the bankruptcy filing appears clearly an attempt at marital reconciliation.

Like the trustee, the Court questions a number of Mr. Prestwood's statements regarding the transfer of his California property and other aspects of his business dealings. However, on the issue of his homestead, the Court must conclude that the debtor has provided sufficient evidence of his residence in the Pompano Beach condominium and his "actual intent" to live there permanently prior to the filing of this bankruptcy case. One's homestead or domicile is a rather simple equation in the end: residence plus intent to remain. Ultimately, despite the contradictions in the testimony, the evidence appears clear that at some point well before the filing of this case, the debtor lived in the Pompano Beach property. It is also clear that despite his wife's objections, the debtor intended to reside there indefinitely, and would still be there but for a desire to reconcile with his wife. Under such circumstances, it seems as though it would violate the "liberal exemption" afforded under Florida law to rule against the debtor. Exceptions to the homestead exemption are to be "strictly construed" in favor of claimants, and the Court can only conclude on the evidence before it that the debtor resided in the property and "in good faith" intended it to be his permanent home.

Accordingly,

IT IS ORDERED that the debtor resided in the Pompano Beach property as of the petition date, and intended that it serve as his permanent home so as to justify the debtor's claim to the homestead exemption under Article X, Section 4 of the Florida Constitution and FSA Sections 222.01, 222.02, and 222.05. The trustee's objection to the debtor's homestead exemption is overruled.