**IN RE: Gary Neal WILEY, Lura Shaffer Wiley, Debtors.**

**CASE NO.:  14–40450–KKS**

United States Bankruptcy Court, N.D. Florida, Tallahassee Division.

Signed 06/03/2016

Allen Turnage, Allen Turnage, P.A., Tallahassee, FL, for Debtors.

Theresa M. Bender, Theresa M. Bender, P.A. Tallahassee, FL, Sarah St John Walton, Philip A. Bates, P.A., Pensacola, FL, for Trustee.

## MEMORANDUM OPINION ON TRUSTEE'S OBJECTION TO CLAIM OF EXEMPTIONS (Doc. 55)

KAREN K. SPECIE, United States Bankruptcy Judge

The Debtors own a home on the west coast of Florida, in the Panhandle. They claimed this home as their homestead under Florida's Constitution and exemption statutes. The Trustee objected, asserting that the home does not qualify as homestead because the Debtors have never actually resided there. In Florida, in order for property to qualify as exempt homestead the owners must have an actual intention to reside on the property as their permanent place of residence, and they must actually use and occupy the property as their permanent home.

The Court received evidence and heard testimony beginning on November 16, 2015, and concluding on January 26, 2016, after which the parties submitted proposed

findings of fact and conclusions of law.[1] Because the Trustee has met her burden to prove by a preponderance of the evidence that the property was not the Debtors' homestead as of the petition date, and has never been established as the Debtors' constitutional homestead, the Trustee's Objection will be sustained.

## BACKGROUND

The Debtors moved to Tallahassee from Fort Lauderdale in 1988. Shortly thereafter they began buying, fixing up, living in and re-selling rental properties. At various times between 1988 and the petition date the Debtors, individually and through Highlands Consulting, LLC ("Highlands"), an entity wholly owned by Ms. Wiley, have owned a total of twenty-four properties in and around Tallahassee, Florida.[2] Ms. Wiley is a licensed real estate broker and appraiser. She has worked for the State of Florida on eminent domain matters for over twenty years. Mr. Wiley has spent the majority of his work life running, maintaining and managing the couple's multiple rental properties. As of the date of the petition he was working as a painting contractor in Tallahassee.

The Debtors filed their Chapter 7 Petition on August 6, 2014. They listed certain real property located in St. Teresa, Florida ("St. Teresa") as exempt homestead on their Schedule C. The Trustee timely filed her objection to this claim of exemption, arguing that the Debtors have never established St. Teresa as their constitutional homestead.[3]

When they filed their petition the Debtors were living in "Stratfordshire," an attached single-family townhome in Tallahassee purchased by Ms. Wiley's father about fifteen years ago.[4] From the petition date through the trial they have continued living in Stratfordshire during the week and staying at St. Teresa on weekends and holidays. For the majority of 2006 through 2014 the Debtors have lived at either Stratfordshire or in a single family home owned by Highlands, known as "Tim Tam."

## ST. TERESA

St. Teresa is located in a small community in Franklin County, Florida, on the Gulf of Mexico in the "Big Bend" area, approximately one hour's drive southwest of Tallahassee. The Debtors describe St. Teresa as a two bedroom, one bath, single-family dwelling of less than 1,100 square feet. They listed the value of St. Teresa at $400,000, subject to a first mortgage in the amount of $146,000.00.

For years the Debtors were constantly on the watch for property on the water for

1. (Docs. 189 & 192). These proposed findings and conclusions were helpful.

2. Highlands is general real estate firm. Ms. Wiley owned 100% of Highlands as of the Petition date. At other times, she & Mr. Wiley each owned 50%; at unspecified times Mr. Wiley had a power of attorney to run Highlands.

3. The attorney for the Trustee also represents creditor Synovus Bank, which held mortgages on three of the Debtors' rental properties. Synovus Bank has filed a claim in the amount of $531,681.88, of which $318,681.98 is listed as unsecured. (Claim 7–1.)

4. Highlands purchased Stratfordshire from Ms. Wiley's father on September 10, 2007. Highlands was the owner until sometime in 2010, when Highlands transferred it back to Ms. Wiley's father (or parents). As of the date of the petition and at the time of their testimony, the Debtors lived at the Stratfordshire Property at least during the week. Ms. Wiley testified that her father has made it available for them to live in since 2006 because it is convenient to their jobs and has been convenient to the sons' schools; he has never asked for and they have never paid him rent.

sale in St. Teresa. Such property, according to them, seldom comes on the market. For several years prior to purchasing St. Teresa in 2006, the Debtors had rented properties near, but not on, the water in St. Teresa, Florida. They had also owned some townhomes and a vacant lot there for recreational purposes, but those were not on the water. In 2005 Ms. Wiley was diagnosed with breast cancer. Ms. Wiley testified that her diagnosis and subsequent surgeries and treatments accelerated her desire to buy a "dream home" and live on the beach.[5]

One weekend in May of 2006 as he was using a nearby boat ramp, Mr. Wiley saw a "for sale" sign in front of St. Teresa. After calling his wife in Tallahassee to verify that they should try to buy St. Teresa, he made a full price offer ($625,-000) the same day. A fast-paced bidding war ensued, culminating with the Debtors signing a contract to purchase St. Teresa only one or two days later, for $750,000.

The Debtors ultimately took title to St. Teresa on November 11, 2006 as part of a "like kind exchange," pursuant to Section 1031 of the Internal Revenue Code (26 U.S.C. § 1031). During the months between obtaining the contract to buy St. Teresa in May and closing in November, in order to accomplish this exchange the Debtors attempted to sell nine parcels of rental property in Tallahassee. They ultimately sold some of these parcels and mortgaged the rest to raise the money with which to purchase St. Teresa.

The Debtors described the § 1031 exchange as a way to defer paying capital gains taxes on their rental properties, potentially forever, by rolling the proceeds from (or exchanging) the properties into St. Teresa.[6] Immediately after obtaining the contract to purchase St. Teresa the Debtors began contacting attorneys and accountants.

After closing, the Debtors stayed at St. Teresa with their two sons for two or three weeks and transported the boys back and forth to private school in Tallahassee. They then rented an apartment in Tallahassee, where both sons were attending school and the Debtors both had jobs. They did not stay at St. Teresa longer because Ms. Wiley was "overwhelmed" with the thought of trying to home-school the boys from there.

Although both Debtors testified that they understood the significance of a § 1031 "like kind" exchange, at trial Ms. Wiley testified that her goal in 2006 was to "move back" to St. Teresa after the 2006–07 school year was finished. According to her, before she went back to St. Teresa to "stay" her father, who was also the Debtors' accountant, told her that they had to rent St. Teresa and only go there for maintenance and upkeep for a period of time to comply with the Internal Revenue Code. He further advised that if they lived in St. Teresa they could lose the tax advantages provided by the § 1031 exchange.

Ms. Wiley's testimony as to her intent to live in St. Teresa in 2006 is not credible. The Debtors began working with attorneys

---

**5.** Although this Court has ruled on homestead claims in other cases using the term "dream home," in this case the use of this term to describe the St. Teresa Property comes directly from the Debtors. (Doc. 189, p. 2.)

**6.** 26 U.S.C. § 1031, otherwise known § 1031 of the Internal Revenue Code, allows investors to defer the payment of taxes on any exchange of like-kind properties. The proper-

ties must be held for use in a trade or business or for investment. Property used primarily for personal use, like a primary residence, a second home or vacation home, does not qualify for like-kind exchange treatment. Internal Revenue Service, *Like–Kind Exchanges Under IRC Code Section 1031*, (February 2008), https://www.irs.gov/uac/like-kindexchanges-under-irc-code-section–1031.

and accountants shortly after contracting to buy St. Teresa in May 2006. Their decision to buy St. Teresa as part of a § 1031 exchange was deliberate, and undertaken with professional advice and counsel. Once the Debtors decided to take title via the § 1031 exchange, they knew full well that they could not live in St. Teresa. In any event, even if one believes the testimony that Ms. Wiley did not realize until after closing that they could not live in St. Teresa, once they found out they elected to retain the tax benefits of the § 1031 exchange rather than move into St. Teresa and occupy it as their homestead. So, St. Teresa was definitely not the Debtors' homestead in 2006.

From 2007 through 2009 the Debtors lived in Tallahassee and rented St. Teresa to others for short periods of time. They visited St. Teresa on a limited basis to make repairs and improvements, for which they kept all of their receipts. St. Teresa was not the Debtors' homestead during this time.

In 2008, during the time the Debtors were not living in St. Teresa so that they would not lose the § 1031 exchange benefits, Ms. Wiley requested permission from her employer to telecommute from their then home in Tallahassee (Tim Tam) or St. Teresa. That request was denied. Also beginning in 2008, even though they were not living in St. Teresa the Debtors claimed Florida homestead tax exemption on that property. This minimized the real estate taxes on St. Teresa at the same time that the Debtors were sheltering their taxable gains from the investment properties they had exchanged for St. Teresa. Because the Debtors knew that St. Teresa was not their homestead, their claim of homestead tax exemption for St. Teresa was improper and not truthful.

The Debtors listed St. Teresa as rental property on their income tax returns for 2007 through 2009, and as their primary residence on their income tax returns beginning in 2010. The Debtors did not rent St. Teresa after 2010. Ms. Wiley testified that she believed that they had satisfied the § 1031 requirements by early 2010.

Until 2010, neither of the Debtors stayed at St. Teresa for any significant period of time. Ms. Wiley testified that 2010 was a "volatile year" during which she, her husband and their family were "staying in different places." Ms. Wiley stayed by herself at St. Teresa from sometime in June through November of 2010, after one of their sons graduated high school. This was, according to her, during a time of financial difficulties, marital strife, and to "escape chaos." During this time Ms. Wiley was still working in Tallahassee so she sometimes stayed at St. Teresa and sometimes did not. Mr. Wiley lived in Tallahassee with the couple's sons at their Tim Tam home and spent some weekends at St. Teresa during 2010. For much of 2010 Ms. Wiley stayed with a friend, Audrey, in order to "get away," and also stayed in their Tim Tam home. At the end of 2010, Ms. Wiley's father offered to get rid of his tenant and let her live full-time in Stratfordshire, which is where she resided through the end of 2011.

Sometime in 2011 the Debtors' youngest son was having behavioral problems and was suspended from school. Mr. Wiley left Tallahassee to stay at St. Teresa with that son from May 4 through September 9, 2011. Mr. Wiley's job during this time was to manage and repair the family's rental properties. He and the son traveled back and forth between St. Teresa and Stratfordshire in Tallahassee frequently because the rental properties required a significant amount of work that year. Mr. Wiley and the son spent "lots of time" in Tallahassee; they spent holidays and weekends at St. Teresa. During 2011 Ms.

Wiley visited St. Teresa but because of their son's behavioral problems she was not comfortable being in the same place at the same time. She agreed that during 2011 the family lived at Stratfordshire on weekdays.

Neither Debtor spent a significant amount of time at St. Teresa in 2012 or 2013; rather, their primary residence was Stratfordshire in Tallahassee. During 2014 Ms. Wiley went to St. Teresa on occasion but did not reside there. She did not go there with her husband or either son. Ms. Wiley could not recall how often she went to St. Teresa between 2012 and 2014. As of the petition date, the Debtors were still living in Stratfordshire on weekdays.

## THE DEBTORS' RESIDENCES AND PRIMARY ACTIVITIES

Leading up to and through the date they filed their Chapter 7 petition most of the Debtors' time has been spent in Tallahassee. Their primary activities have also been in Tallahassee. The Debtors have a gym membership, do their banking, and receive their mail in Tallahassee at either Stratfordshire or a Tallahassee post office box.[7] Both of the Debtors' sons attended school in Tallahassee. Since 2007 the Debtors have primarily resided in two homes in Tallahassee: Tim Tam and Stratfordshire. They initially lived in Stratfordshire. They then moved to Tim Tam where they lived for about one and one-half years. While

their sons were attending high school in Tallahassee they moved back to Stratfordshire. Ms. Wiley attends the Moose Lodge in Tallahassee, one of their sons attends college in Tallahassee and lives at home with them at Stratfordshire, and Ms. Wiley has played "Bunco" with friends in Tallahassee once a month for about the past five years.

The corporate address for Highlands has been St. Teresa since 2008. Mr. Wiley changed the address on his driver's license from his Tallahassee P. O. Box to St. Teresa in 2012. Ms. Wiley's brokers and appraisal licenses have been registered at St. Teresa since about 2008.

The Debtors lease a Honda automobile. They listed their address on that lease as Stratfordshire.

## USE AND OCCUPANCY OF ST. TERESA

The Trustee introduced the Debtors' cell phone records from 2010, 2011 and 2014.[8] According to those records and testimony of AT & T representative, Jake, Hagins, the vast majority of the Debtors' cellular activity during 2010, part of 2011 and 2014 occurred in Tallahassee.[9] During 2010 Ms. Wiley made or received 4 of 6,428, and Mr. Wiley made or received 60 of 14,485, calls at St. Teresa. From May 1 through September 30, 2011, Ms. Wiley made or received 565 of 7,889, and Mr. Wiley made or

---

7. The Debtors gave conflicting testimony about why they receive mail in Tallahassee rather than in St. Teresa or Panacea, Florida, which is close by. At their 341 meeting Ms. Wiley testified that "[t]hey don't take mail down in Franklin County." Trustee Ex. 12, at p. 6. Mr. Wiley testified that the Debtors had no mailbox at St. Teresa; that "St. Teresa has no mail boxes. You can't get mail there." Id. at p. 23. At the evidentiary hearing on the Trustee's objection to exemption the Debtors admitted that mail can be delivered to St. Teresa and that they do have a mailbox there.

8. The parties stipulated to each of the Debtors' cell numbers and which calls on their cell phone records were made from the latitude of St. Teresa.

9. Mr. Hagins testified that during those times eight cellular telephone towers could be used to connect a voice cellular call made or received at St. Teresa.

received 60 out of 14,485, calls at St. Teresa. In 2014, Ms. Wiley made or made or received 18 of 4,038, and Mr. Wiley made or received 296 out of 7,570, calls at St. Teresa. Cumulatively, the phone records show that during 2014 Ms. Wiley made or received calls at St. Teresa 6 days out of 365, and Mr. Wiley made or received calls at St. Teresa 78 out of 365 days.

Panacea is the closest shopping location to St. Teresa. The Trustee introduced some of Debtors' bank records at trial. Those records show that from May through September of 2014 Ms. Wiley had debit card transactions in Panacea, Florida on two out of 90 possible dates; and Mr. Wiley had debit card transactions in Panacea on only ten out of 92 possible dates.

The Trustee introduced photos of the interior of St. Teresa to show that the interior was void of things "normally" seen in someone's permanent home. The photos reveal only a few pictures on the walls, very few keepsakes, and no clothing or jewelry. There are bunk beds in the second bedroom and a futon and other "mismatched" older furniture in other parts of the house. The Debtors testified that the bunk beds were their sons' beds when they were "little" and that the futon and other furniture in St. Teresa they'd had "for years and years." [10] This is in contrast to Stratfordshire, in which the furniture is well-matched, and there are a significant number of family photos, keepsakes and clothing.[11]

The Trustee introduced copies of insurance declarations for St. Teresa as well as testimony of a State Farm Insurance agent. The "occupancy" listed on the insurance declarations from March 2010 through March 2011 show St. Teresa as "owner" occupied and the "use" as "secondary." According to the insurance agent, those designations reflect that the property was the owners' secondary, not primary, residence. From September 2011 through the petition date, the occupancy designation for St. Teresa was "tenant" and the use designation was "rental."

In support of their claim that St. Teresa is their homestead the Debtors offered their own testimony, as well as that of some friends and a sister-in-law, Roseann Shaffer. Most of this testimony supported that of the Debtors: that it was the Debtors' intent to live in St. Teresa; that Ms. Wiley has always thought of St. Teresa as "home;" and that Ms. Wiley loves and has always wanted to live on the beach. The testimony of these friends and the sister-in-law, while well-intentioned, is not persuasive and will not be given any weight, especially as to what the Debtors' intentions may have been with respect to St. Teresa and its alleged homestead status. One of the friends had never been to St. Teresa, none had ever played "Bunco" there, and the other friends and sister-in-law had been to St. Teresa only occasionally.[12] Even if this testimony were convinc-

---

10. At the time of trial the Debtors' sons were 20 and 24 years of age. That means that as of the petition date, the sons were 18 and 22 and when Ms. Wiley first stayed at St. Teresa for more than a couple of weeks at a time, in 2010, the sons were 16 and 20. It is not believable that boys of those ages would live permanently in a place where they had to share one bedroom, sleep on bunk beds they had as young children, and share the only bathroom with each other and their parents.

11. The Debtors purchased and own the furniture in the Stratfordshire home.

12. Roseanne Shaffer testified that she visited there "on occasion." Lucy Baer had never been to St. Teresa. Mary Lewis said she went there a "couple of times a month, probably." She then went on to say that she didn't visit as frequently after she went back to work in 2012, but from 2006 through 2008 or 2009 she visited there during the summer. Steve Waller, the repair man, worked on the St.

ing, the Debtors' intentions are only half of the equation.

Other evidence supports finding that the Debtors did not consider St. Teresa to be their permanent home in 2010. For example, the Debtors' rental properties were all pledged to secure the same loan at Tallahassee State Bank, n/k/a Synovus Bank (the "bank"), with which the Debtors had had a long-term banking relationship.[13] In 2010 the bank became concerned with the loan-to-value ratio on the loan secured by the rental properties. In order to reduce the debt on the rental properties the Debtors mortgaged St. Teresa. Prior to this the Debtors had owned St. Teresa free and clear since they purchased it in 2006. The loan documents for this St. Teresa loan state that the loan would be used for "business purposes."[14] Although the Debtors' testimony that the term "business purposes" described what the money was to be used for, it is not logical for the debtors to have pledged St. Teresa for a loan with which to pay down rental, investment properties if St. Teresa was truly the Debtors' home.

## DISCUSSION

Central to whether St. Teresa was the Debtors' exempt homestead as of the petition date are two issues of fact: 1) whether the Debtors ever established St. Teresa as their homestead, and 2) if so, whether St. Teresa remained the Debtors' homestead as of the petition date.

State law determines the nature and existence of a debtor's property interest.[15] The Debtors' claim of homestead exemption as to St. Teresa is based on Fla. Const. Art. X, § 4(a)(1), and Fla. Stat. §§ 222.01 and 222.02. While Florida's homestead exemption is to be liberally construed in favor of granting the exemption, Florida's homestead laws are designed to protect the place of actual residence of the debtor and his family.[16] "Under the Florida decisions, actual occupancy of a home with intention to remain there and make it the home of the family, the place of their actual use and occupancy, is essential to the homestead right."[17] Debtors may not claim the Florida homestead exemption on property that is not used as their home.[18] A secondary or vacation home does not implicate the same acute public policy concerns relating to the establishment and protection of a stable, financially secure primary residence.[19]

In Florida, "[t]he character of property as a homestead depends upon an actual intention to reside thereon as a permanent place of residence, coupled with

Teresa property in 2006 and maybe in 2007. He also went back in 2012 or 2013 and helped one day on a "roof job."

13. The Debtors testified that they had done about 15–20 loan renewals with the bank by 2010.

14. In 2014 the bank called the St. Teresa loan. The Debtors were able to obtain a new loan on St. Teresa from a private party in May of 2014. By this time all of the Debtors' mortgage loans were in default.

15. *In re Sinnreich*, 391 F.3d 1295, 1297 (11th Cir. 2004) (citing *Butner v. United States*, 440 U.S. 48, 55, (99 S.Ct. 914, 59 L.Ed.2d 136, 1979)).

16. *In re Middleton*, 462 B.R. 832, 835 (Bankr. N.D. Fla. 2011) (citing *Quigley v. Kennedy Ely Ins., Inc.*, 207 So.2d 431, 432 (Fla. 1968).

17. *Croker v. Croker*, 51 F.2d 11, 12 (Fla. 5th Cir. 1931).

18. *In re Yonkin*, No. 6:12–bk–07357–KSJ, 2013 WL 100416, at *1 (Bankr. M.D. Fla. 2013).

19. *Reinish v. Clark*, 765 So.2d 197, 210 (Fla. 1st DCA 2000).

the fact of residence."[20] The objecting party, here the Trustee, has the burden of showing that the debtor claiming the exemption is not entitled to it.[21]

■ In *In re Harle*, the bankruptcy court applied a test pronounced in 1943 by the Florida Supreme Court with respect to constitutional homestead: "the character of property as homestead depends upon an actual intention to reside thereon as a permanent place of residence, coupled with the fact of residence."[22] In so doing, the court in *Harle* held that in order for homeowners to qualify for the homestead exemption, they must meet both an objective test—they must actually use and occupy the home; and a subjective test—they must express an actual intent to live permanently in the home.[23] As the Trustee points out, although this Court has not previously cited or adopted *Harle, per se,* in its rulings on homestead, this Court has followed the same rationale: that is, that in order to successfully claim homestead exemption a debtor must actually reside in the property as their homestead, as well as have the intention to continue to reside there.[24]

■ The subjective test is, as indicated, one that requires proof of the Debtors' intentions. The Trustee has introduced no evidence sufficient to disprove that the Debtors' intentions may have been, at least perhaps beginning in 2010, and may still be, to make St. Teresa their home.

The Debtors admit that the hurdle they must overcome is the objective test—their actual use and occupancy of St. Teresa. Although they concede that their physical occupancy of St. Teresa has not been continuous, they insist that Ms. Wiley's "move" by herself to St. Teresa in 2010 was sufficient occupancy to establish St. Teresa as their homestead. This position, while not surprising, is contradicted by the actual events.

The reality is that Ms. Wiley stayed at St. Teresa in 2010 only to get away from the rest of the family. She went back to Tallahassee shortly after she first went to St. Teresa in 2010. She continued to work in Tallahassee, as did Mr. Wiley, and the boys continued attending school there. The record is devoid of evidence that the Debtors ever moved into St. Teresa as a family and lived there or used it as their permanent home. Under the totality of the circumstances, Ms. Wiley's one several week stay at St. Teresa, by herself and without Mr. Wiley or the couple's two sons, is insufficient to have established that property as the Debtors' homestead.

The Debtors argue that they did not abandon St. Teresa as their homestead upon Ms. Wiley's "temporary return" to their Tallahassee homes in 2010. This argument assumes that the Debtors actually established St. Teresa as their homestead to begin with. They did not. Not only was St. Teresa never established as the Debt-

---

20. *Hillsborough Investment Co. v. Wilcox,* 152 Fla. 889, 13 So.2d 448, 452 (1943); *see also Croker v. Croker,* 51 F.2d 11 (5th Cir. 1931).

21. *In re Sanders,* 72 B.R. 124, 125 (Bankr. M.D. Fla. 1987).

22. *Hillsborough Inv. Co. v. Wilcox,* 152 Fla. 889, 13 So.2d 448 (1943).

23. *In re Harle,* 422 B.R. 310, 314 (Bankr. M.D. Fla. 2010).

24. *See In re Middleton,* 462 B.R. 832 (Bankr. N.D. Fla. 2011); *In re Clark,* 3:12–bk–30716 (Bankr. N.D. Fla. 2013); *Regions Bank v. Ross,* 3:11–ap–3041 (Bankr. N.D. Fla 2013). In *Harle,* unlike here, the debtors had actually resided in one property as their homestead for several years, and gradually moved out of that property into a new homestead. There was no issue that the debtors had never resided in either place as their homestead in the first place.

ors' homestead when Ms. Wiley stayed there in 2010, Ms. Wiley's return to Tallahassee after that stay was anything but "temporary."

The Debtors next argue that Mr. Wiley's "move" to St. Teresa with their younger son in 2011 established that property as their homestead. Once again, the facts defuse the argument. Mr. Wiley and the younger son only stayed in St. Teresa during the summer of 2011, while there was no school. This supports the Trustee's argument and is consistent with the other evidence that St. Teresa was a second, or vacation, home. Although the Debtors suggest that Mr. Wiley intended to stay at St. Teresa longer than four months, it is undisputed that he and the younger son moved back to Tallahassee in September of 2011, as school was beginning.

Other than this summer of 2011, rather than having ever lived at St. Teresa, Mr. Wiley has visited there "as often as possible" prior to filing this Chapter 7 case. That is not enough to prove actual use and occupancy sufficient to establish constitutional homestead. There is no evidence that the Debtors have ever furnished or utilized St. Teresa as more than a vacation home, a weekend getaway, or a place to stay during times of marital or family strife.

The Debtors rely on the Florida Supreme Court case of *Read v. Leitner*.[25] In *Read*, a family claimed homestead on property in De Soto County, Florida (the "country place"), where they originally lived.[26] At some point the family moved to the city of Arcadia where the father was engaged in business and the children attended school.[27] The family moved back to the country place; they then moved again to Arcadia where they lived in a house owned by the wife for several years.[28] During the absences from the country place the husband frequently went there to maintain and repair it; the debtors also rented the country place to others from time to time.[29] While the family was living in Arcadia creditors obtained judgments against the husband. Before the judgment creditors levied on the country place, the family moved back there.[30] When the judgment creditors attempted to have the country place sold, the husband testified that he never intended to permanently abandon that property as the family's homestead. The trial court held that the family had abandoned the country place as their homestead, and ordered an execution sale of the property.[31] The Florida Supreme Court reversed, holding that it is not essential that the occupancy of homestead be continuous, provided the owners continually have the intent to return to it as their homestead, and their absence is reasonably shown to be for the temporary benefit of the family.[32]

The Debtors argue that their lifestyle is not much different from the family in *Read*, in that they have lived somewhere other than their claimed homestead because of work and family. This argument ignores the major distinguishing fact in *Read*: the Read family had actually lived in the country place together as a family before moving to Arcadia. The issue before

**25.** *Read v. Leitner*, 80 Fla. 574, 86 So. 425 (1920).

**26.** *Id.* at 426.

**27.** *Id.*

**28.** *Id.*

**29.** *Id.*

**30.** *Id.*

**31.** *Id.*

**32.** *Id.*

the Court in *Read* was whether the debtors had abandoned their homestead, not whether they had established the country place as their homestead in the first instance. Here, unlike in *Read*, there is no evidence that the Debtors ever established St. Teresa as their homestead by actually residing there. In fact, the Trustee has proved, by a preponderance of the evidence, the opposite. Having never established St. Teresa as their homestead, the Debtors had no homestead to abandon.

*Read* can also be distinguished because the family returned to live in the homestead "before executions under the judgments were levied." Here, the operative date for deciding a debtor's entitlement to an exemption under § 522(f) is the date the petition was filed.[33] As of the date of the petition, the Debtors still did not live in St. Teresa. Rather, they were living in Stratfordshire during the week and spending, at most, their weekends at St. Teresa.

The Debtors rely also on *Tolz v. Prestwood* and *In re Lloyd*. In *Prestwood*, the debtor and his family moved from California to Florida almost three years pre-petition.[34] While the family lived in the Florida home the debtor continued to work for a company in California and traveled there often.[35] Prior to the petition date, the debtor did not have a Florida bank account or own a car registered in Florida. The debtor did not obtain a Florida driver's license until the day he signed his bankruptcy petition, and the debtor's mailing address on his petition was his California address.[36] In overruling the objection to the debtor's claim of his Florida residence

as homestead the bankruptcy court acknowledged that many people live a "semi-nomadic existence traveling routinely between various points that could almost equally be called 'home.'"[37]

The Debtors argue that their "connection" with St. Teresa is stronger than the debtor's connection with his Florida home in *Prestwood*. They point to the fact that their driver's licenses list their address as St. Teresa and that they are registered to vote where St. Teresa is located. While these facts may be evidence of the Debtors' subjective intent, they do not prove, objectively, that the Debtors have ever occupied St. Teresa as their homestead. In *Prestwood*, the debtor moved to Florida with his wife and children; the debtor and his family had truly moved to and lived in the Florida home. By contrast, the only time these Debtors ever occupied St. Teresa together was for about two or three weeks in 2006, right after purchasing it and before the second half of the school year began. This was at a time when they could not legally occupy St. Teresa as their home if they wanted to keep the tax advantages of the 1031 exchange. Instead of being evidence that the Debtors established St. Teresa as their homestead, this is further evidence that they occupied it as a vacation property before returning to work and school.

In *In re Lloyd*, as in *Prestwood*, the bankruptcy court's inquiry centered on whether the debtor had abandoned her homestead, not whether the debtor had ever established a homestead.[38] The debtor

---

**33.** *See In re Allen*, 217 B.R. 945, 951 (Bankr. M.D. Fla. 1998) (citing *Owen v. Owen*, 500 U.S. 305, 314 n. 6, 111 S.Ct. 1833, 1838 n. 6, 114 L.Ed.2d 350, 360 n. 6 (1991).

**34.** *In re Prestwood*, 322 B.R. 463 (Bankr. S.D. Fla. 2005).

**35.** *Id.* at 465.

**36.** *Id.* at 466.

**37.** *Id.* at 468.

**38.** *In re Lloyd*, 394, B.R. 605 (Bankr. S.D. Fla 2008).

in *Lloyd* had lived in the homestead in Key West, Florida for a number of years prior to·moving to California.[39] The bankruptcy court found that the debtor never abandoned the homestead status of the Key West home.[40]

In *In re Middleton*, this Court found that the addresses on the debtor's voter registration and driver's license were not dispositive of whether a certain property constituted the debtor's homestead.[41] The Court focused instead primarily on where the debtor conducted business, maintained bank accounts, engaged in social events and attended church.[42] Although the Debtors have the St. Teresa address on their drivers' licenses and are registered to vote in the county where that property is located, all of their socializing, banking, business and school have taken place in Tallahassee.[43]

In *Regions Bank v. Ross*, Bankruptcy Judge Mahoney considered evidence of where the debtor made most of his cell phone calls in ruling that the debtor was not a domiciliary of Florida during the relevant time period.[44] The phone records in evidence show that the vast majority of the cell phone calls made and received by both Debtors during 2010, part of 2011 and 2014 occurred in Tallahassee, and not St. Teresa.

The fact that Ms. Wiley's brokers and appraiser licenses are registered to St. Teresa, as is the corporate address for her real estate company, Highlands, is yet more evidence of the use of St. Teresa for other than the family home.

Ms. Wiley's, and perhaps both Debtors' intentions may have been, and may remain, to live in St. Teresa. But intentions comprise only one of a two-prong test for whether property constitutes exempt homestead. The other prong, the objective prong, is whether the Debtors and their family resided on the property and used it

---

**39.** *Id.* at 608.

**40.** *Id.* at 611. The Debtors also cite to *In re Betancourt*, 154 B.R. 90 (Bankr. S.D. Fla. 1993), in support of their argument that they never abandoned St. Teresa as their homestead. Once again, this argument misses the mark. The question here is not whether the Debtors abandoned their homestead, but rather whether they ever established St. Teresa as their homestead to begin with. In *Betancourt* the court held that a temporary absence from a homestead for reasons of health, business or recreation, or even the temporary rental of the homestead, does not necessarily demonstrate an intent to abandon the homestead. *Id.* at 92, This holding is inapplicable.

**41.** *In re Middleton*, 462 B.R. 832, 835 (Bankr. N.D. Fla 2011). The debtors in *Middleton* had lived in Georgia for many years. About thirty days before defaulting on a $785,000 obligation the husband moved to a property the couple owned in Panama City and claimed that as his homestead; the wife did not move, nor did she have any intention of moving, to Panama City. *Id.* at 833.

**42.** *Id.* at 834.

**43.** *See In re Middleton*, 462 B.R. at 834; *In re Clark*, 3:12–bk–30716 (Bankr. N.D. Fla. October 3, 2013); *Ross*, slip op. at 12, 13.

**44.** *Regions Bank v. Ross (In re Ross)*, Ch. 7 Case No: 3:11–bk–30392, Adv. No. 3:11–ap–3041, slip op. at 12, 13 (Bankr. N.D. Fla. Jan. 4, 2013). The debtor in *Ross* claimed an annuity as exempt. Regions Bank challenged this claim of exemption on the basis that the debtor was not a domiciliary of Florida. In order to be eligible for Florida's exemption laws, the debtor had to be a domiciliary of the state of Florida for "the 730 days immediately preceding the date of the filing of the petition." *Id.* at *11. In ruling that the debtor was not domiciled in Florida, the Court considered, among other things, where the debtor did his banking, played golf, made retail purchases, where he actually lived for the majority of the time, and where he made most of his cell phone calls. *Id.* at *12, 13.

as their homestead.[45] This these Debtors have never done. Rather, they have stayed there only when one or both boys were out of school, mostly during summer months and on weekends and holidays, and when one or the other needed to escape the rest of the family.

## CONCLUSION

One of the most difficult decisions bankruptcy judges face is whether to permit debtors to keep certain property they claim as homestead. Such cases, including this one, are commonly fraught with emotion. Ms. Wiley's testimony about St. Teresa was at times tearful. Her hope to make St. Teresa her home someday may be genuine. But, as of the date she and her husband filed their Chapter 7 petition, the preponderance of the evidence shows that this hope had not become a reality.

For the reasons stated, it is

ORDERED:

1. The Trustee's *Objection to Claim of Exemptions* (Doc. 55) is SUSTAINED.

2. The Debtors' claim of homestead exemption on the St. Teresa property located at 4096 St. Teresa Ave, St. Teresa, FL 32358 is DISALLOWED.

DONE and ORDERED on June 3, 2016

---

**45.** *See In re Middleton,* 462 B.R. at 835 (citing *Quigley v. Kennedy Ely Ins., Inc.,* 207 So.2d 431, 432 (Fla. 1968). "While it is well established that Florida's homestead exemption is to be liberally construed in favor of granting the exemption, the purpose of the homestead law is to protect and preserve the family home."